**NATIONAL QUARRIES CO. v. DETROIT, T. & I. R. CO.**

No. 7206.

Circuit Court of Appeals, Sixth Circuit.

July 3, 1937.

George E. Schroth, of Tiffin, Ohio (Schroth & Schroth, of Tiffin, Ohio, Harry O. Bentley, of Lima, Ohio, and Nichols, Morrill, Wood, Marx & Ginter, of Cincinnati, Ohio, on the brief), for appellant.

J. S. Pratt and H. R. Miller, both of Toledo, Ohio (Melvin C. Light, of Lima, Ohio, and Bodman, Longley Bogle, Middleton & Farley, of Detroit, Mich., on the brief), for appellee.

Before HICKS, MACK, and SIMONS, Circuit Judges.

MACK, Circuit Judge.

On this appeal from a judgment for defendant in an action for breach of contract, tried by the court after waiver of jury, the sole question is, as it was in the trial court, the proper interpretation of paragraph 3 of the contract dated June 14,

1927.[1] The special findings made in support of the court's conclusion are for the most part restated in substance in the opinion of the late Judge Hahn from which we quote as follows:

"The contract is one of settlement between the parties. Plaintiff's quarry lands lie on both sides of defendant's track. Its crushing plant is located on the west side; * * * it could not work its property on the east side of the track without tunneling under defendant's railroad track. This it did about 1922, without the consent of the defendant. * * * Defendant brought an action against plaintiff to quiet title to the lands that had been tunneled. Defendant was successful in that action in the lower court, and at the time [the contract] was executed, the action was pending in the state court of appeals on an application for a rehearing.

"Defendant had for several years prior to the execution of the contract of settlement contemplated improvements in its system, the making of a cutoff, which involved the use of 10.71 acres out of about 33 acres of plaintiff's land lying east of defendant's track. During the latter part of 1924, defendant brought an action to condemn this part of plaintiff's land. Plaintiff then brought an action in this court seeking to enjoin further proceedings in the condemnation action. * * * This action terminated unfavorably to plaintiff. * * * Pending the proceeding in this court, plaintiff continued to operate its quarry, such operations involving to some extent the 10.71 acres defendant sought to condemn for railroad purposes.

" * * * Defendant brought an action for an injunction to prevent further operation of the quarry, in the Court of

---

[1] "Detroit, Toledo and Ironton
Railroad Company
"General Office
"Detroit, Michigan, June 14th, 1927.
"National Quarries Company
"Findlay, Ohio.
"Gentlemen:

"Confirming our conference of this morning at which Mr. I. N. Bushong, Mr. Palmer, Mr. F. L. Rockelman and Mr. J. Crawford were present.

"It is understood that the D. T. & I. Railroad will change the proposed route of their tracks so that they will avoid crossing the properties of the National Quarries Company. In consideration for this it is agreed:

"1. All pending litigation between the National Quarries Company and the D. T. & I. Railroad shall be dismissed by mutual consent, without costs to either party as against the other, except as herein provided.

"2. You will convey to us by quit-claim deed the land under our present right of way, title to which is now in dispute. You are to agree also that we may take a decree in the proceedings pending for the same at our own cost. In consideration for this quit-claim deed and decree we will grant to you, your successors or assigns, the right to use and maintain the present tunnel through said land as long as same may be required for quarry purposes.

"3. Whatever dirt may be required to make fills or railroad beds for tracks of the D. T. & I. Railroad between the right of way of the Pennsylvania Railroad and the Village of Cairo, Ohio, shall be taken by us at our expense from that portion of your property lying east of the Boose Highway and south of Sugar Creek, beginning at the east line of property (our engineers and your engineers shall agree to the area to be stripped which area so agreed to shall constitute the limit we may be required to take) it being understood that we will construct a proper dike on this tract of land to protect it against the overflow waters of Sugar Creek, it being further understood that after this dike is built it will be maintained by you.

"4. You agree to release the injunction bond which we have filed with the Common Pleas Court of Allen County, Ohio, in connection with the litigation between the two parties, and from all claims on account of the injunction.

"5. You will pay all of your own attorney fees, and we will pay our attorney fees. You will pay the court costs of the litigation between us in the Federal Courts, and we will pay the court costs in the other courts.

"6. We agree to pay you the sum of $6,000.00.

"7. This agreement constitutes a full settlement of all the controversies existing between the parties on account of the matters which have heretofore been in litigation.

"Yours very truly,
"Detroit, Toledo and Ironton
Railroad Company,
"F. L. Rockelman,
"FLR: JS          Vice President.
"We hereby accept the above offer.
"National Quarries Company,
"I. N. Bushong, President."

Common Pleas of Allen County, Ohio. An injunction was granted on condition that defendant furnish a bond against wrongful damages accruing to plaintiff here in the amount of $100,000.00. The bond was furnished and plaintiff's quarry operations were stopped from about August 5, 1926, to April 22, 1927. At about that time, on defendant's own motion, the injunction theretofore granted was modified so as to permit plaintiff to operate that portion of its quarry lands lying east of defendant's track which was not involved in the condemnation proceedings.

"Briefly and roughly, this was the background of the parties when the contract of June 14, 1927, was executed. Various claims were being asserted against each other by the parties to that contract.

"* * * The contract of June 14, 1927, has been fully executed and performed on both sides, with the exception only that the plaintiff claims that the defendant has not performed and fully carried out its obligation under paragraph 3 of the contract. * * *.

"Within several weeks after the execution of the contract, engineers designated by the parties met and agreed upon the area to be stripped in accordance with the parenthetical clause of paragraph 3. The area is that included within red lines upon [a map which] bears the legend: 'Area to be stripped to rock within red boundary' [and] the approval of the authorized engineers of both companies. A letter from Mr. Visscher, of the Legal Department of the defendant company [dated July 22, 1927] in referring to [this map] contains the following statement: 'This blueprint shows the extent of the stripping which is agreed to be done under our settlement agreement, and is in compliance with paragraph 3 of the letter,' etc.

"* * * The progenitor of paragraph 3 of the contract is found in paragraph 5 [2] of a letter from the National Quarries Company to a member of the Legal Department of the defendant company. It proposed a settlement along the lines finally consummated [and] was sent on April 4, 1927.

"On June 14, 1927, the parties held a conference at Detroit, Michigan, [which resulted in the proposal in appellee's letter of that date accepted by appellant].

"At the time this contract was entered into, plaintiff expected to continue in the business of quarrying stone and the defendant company fully expected to make an improvement by way of a cut-off, and this paragraph of the contract would have been mutually beneficial to the parties; whether there would be an excess of benefit to one or the other of the parties does not appear from the evidence.

"Some time after the contract of settlement was entered into between the parties, there was a change of management in the defendant company, and the defendant company in good faith changed its plans and decided not to build the cut-off for the building of which it might have required at least some of the dirt provided for by paragraph 3 of the contract.

"The plaintiff's case was tried solely and only upon the theory that the defendant was absolutely required to strip the area within the red lines of Exhibit 2 and to take the dirt resulting from such stripping. There is no evidence upon which to base a recovery except upon that theory. It is undisputed that in the performance of the contract the defendant stripped 36,700 cubic yards of overburden. It also appears that part of this dirt was used for diking purposes in accordance with the provisions of the contract. There is no showing in the evidence that defendant's actual requirements exceeded this amount, nor is there any showing that if defendant had not changed its plans as to the making of the improvement, further dirt would have been required."

The following findings of fact supplement the foregoing statement:

"8. That part of plaintiff's land which lay east of defendant's original line * * * while suitable for quarrying purposes, had an overburden of dirt which had to be removed or stripped to uncover the surface of the stone.

"9. It was expected by both parties that when the new improvement would be

---

2 "Fifth: Whatever dirt may be required to make fills or railroad bed for tracks of the D. T. & I. Railroad between the right-of-way of the Pennsylvania Railroad and the village of Cairo, Ohio, shall be taken by you at your expense from that portion of our property lying East of the Boose Highway and South of Sugar Creek; it being understood that you will properly dike this tract of land to protect it against the overflow waters of Sugar Creek."

built, the defendant probably would need a large amount of dirt for fills and roadbeds between the point which the new improvement was to cross the existing Pennsylvania tracks and a point at the village of Cairo, Ohio.

"14. At the time this agreement was executed the defendant had acquired a part of the land which it needed for its new right-of-way, as appears by plaintiff's Exhibit No. 4 in evidence. It did not know how much dirt would be required for fills and roadbeds between the village of Cairo and the Pennsylvania tracks, but the parties expected that more would be needed for that purpose than the plaintiff's lands could supply.

"21. On January 10, 1929, the defendant, by letter, requested plaintiff to relieve it from stripping the southwest corner of the area agreed upon, in consideration of defendant's stripping an equal area southeast of the area agreed upon. This was by letter agreed to.

"22. In the summer of 1929 the defendant advertised for and received bids from contractors to complete the stripping of the remainder of the area agreed to be stripped; and the defendant's specifications provided for 'the removal of all overburden exposing a clear rock surface,' * * *

"23. On October 23, 1929, the defendant wrote to the plaintiff saying that 'We have now determined that it is not our present intention to build the cut-off originally proposed, and consequently do not require the dirt from the stripping of your quarry.'

"29. At some time after December 19, 1929, the defendant made further plans to strip by preparing a blue-print map of plaintiff's quarry lands * * * upon which defendant marked certain areas to be stripped with the dates 1930, 1931 and 1932 written therein.

"30. At about the same time when defendant prepared said 'Plaintiff's Exhibit 16' marking the areas to be stripped in 1930, 1931 and 1932, the defendant made certain calculations of the number of cubic yards of dirt to be stripped within each of said areas and set the same forth. * * *"

The alleged breach of contract for which damages are sought was appellee's failure to perform its alleged absolute obligation to remove or strip the overburden of top soil on the area marked out in the map, such stripping down to the rock being a prerequisite to quarrying.

As Judge Hahn stated, this was the theory upon which and upon which alone the case was tried. The question, therefore, is whether the contract imposed an absolute obligation to strip the entire designated area regardless of appellee's requirements, or to strip only so much within that area as appellee might need for fills or track beds if and when it made the intended and expected improvement.

Paragraph 3 of the contract in its original form, without the parenthetical clauses, that is, as it was proposed by appellant in April, 1927, clearly did not compel appellee to remove more dirt than it might need for the intended improvement; equally clear, too, is it that the first part of the clause, "our engineers and your engineers shall agree to the area to be stripped" standing alone would not enlarge or change that obligation. Reliance, however, is placed upon the latter part, "which area so agreed to shall constitute the limit we may be required to take." Appellant contends that "required" as here used, means "ordered" or "directed" by appellant, with a resulting right in appellant to demand, as it did demand, that the entire area be stripped. If the clause had read merely "which area so agreed to we may be required to take," the contention might be deemed plausible. The emphasis, however, is not on the area required to be taken but on the area which "shall constitute the limit" required to be taken. Therefore, even assuming that "required" is equivalent to "ordered or directed by appellant," the only fair interpretation of the entire parenthetical clause would be that the boundary lines to be fixed by the engineers shall determine the limits of the area which, so far as, but only so far as appellee might have need of the top soil thereon, appellant might require appellee to strip. This would necessarily imply as well that appellee could not be required to strip beyond those limits even though its needs might exceed the dirt that would be removed from that area.

Assuming, too, as appellant contends, that the engineers' blueprint with its legend is to be deemed a part of the contract of June 14th, the interpretation of paragraph 3 is not thereby changed. The engineers, of course, were not authorized to state, by legend or otherwise, that some entire area was unconditionally to be stripped by appellee; their function was to fix the

limits, within the fourteen acres of appellant's land located as designated, beyond which under no circumstances appellee need strip. It is evident from the blueprint itself which shows that corners and edges of appellant's property lay without the red lines, that the entire purpose of fixing these limits was due to the need of designating the degree of slope at the edge of the excavation, the location of the toe of the slope and the width of the top ridge or berm, all of which are designated thereon. But for the insertion of these parenthetical clauses and the marking, pursuant thereto, of the boundary lines somewhat within the outer lines of appellant's property, appellee might have been obligated, if its requirements should necessitate this, to strip down to the very edge of appellant's land, and in that case appellant might well have contended for an implied right to quarry to the very edge of its own land regardless of the effect on appellee's adjoining land. Such a right it did obtain as to the southeast corner of its property in January, 1929 (see Finding 21), but then only by appellee's express consent.

The later dealings of the parties do not give a different practical construction to the contract. What defendant thereafter did and what it planned to do, as hereinabove set forth, was done and planned while, up to October 23, 1929, it intended to build the cut-off and thus would need, or at any rate could use the top soil when removed. We cannot hold that the finding of defendant's good faith in abandoning, at least for the time in question, the planned change of track location, is without support in the record or that the changed plan was for the purpose of avoiding the contractual obligation, even though defendant's engineer made further stripping plans in December, 1929, and marked on the blueprint of the property in question areas to be stripped in later years with calculations of the quantities of dirt so to be stripped in each area. The engineer's interpretation of defendant's obligation, if his act of December, 1929, could be deemed such, cannot estop defendant.

Nor do the recited circumstances surrounding the making of the contract justify, much less require, a different interpretation of paragraph 3. Not appellant alone, but each party released claims against the other; the court did not and could not determine their relative value. To do so would have required a trial not only of

each of the pending actions but of the mutual claims not yet brought into litigation. The purpose of the contract was to terminate all claims and pending suits and to give to each of the parties the stipulated considerations.

Appellant urges that it is incredible that the parties intended to have it give up a claim for $100,000 damages growing out of the allegedly wrongful injunction for only $6,000; that therefore they must have intended the obligation to relieve it of the necessity of removing the top soil on the fourteen acres before quarrying therein, to be an absolute one. But while the removal might well be much more advantageous to appellant than would the use of the removed dirt be to appellee, such considerations cannot properly change the only reasonable interpretation of the contract. Moreover, as above stated, appellee likewise had claims for damages against appellant and neither the absolute nor the relative value of the respective claims was determined or determinable in this proceeding.

In the light of the pleadings and the evidence, we concur fully in the views of Judge Hahn as to the sole theory on which appellant based its case, namely, that appellee's obligation to strip the designated area was absolute. It is therefore entirely unnecessary to consider the effect either of the recital of an understanding that appellee would change its proposed route, as creating an express obligation to appellant so to do, or of the creation of a similar implied obligation. The action was not brought for breach of any such obligation nor is there any evidence in this record from which the amount of appellant's damages, due to such a breach, could be determined.

Moreover, while an implied obligation to continue in business might well be relevant in measuring the damages due to the breach of an ordinary requirement contract, we are unable to see that an express or implied obligation of appellee to appellant to construct the contemplated cut-off could in anywise aid in determining whether paragraph 3 of the contract here in question imposes an obligation to strip the entire area or only so much thereof as would yield whatever dirt appellee might need in the course of the new construction. And, we repeat, the sole basis of the instant action is an obligation unconditionally to strip the whole of it, an obliga-

tion, which, as the trial court held, was never created.

Without intimating any dissent from Judge Hahn's agreement with the decision in Re United Cigar Stores Co., 72 F.(2d) 673 (C.C.A.2, 1934), affirming 8 F.Supp. 243 (D.C.S.D.N.Y.), certiorari denied Consolidated Dairy Products Co. v. Irving Trust Co., 293 U.S. 617, 55 S.Ct. 210, 79 L.Ed. 706, and other cases as against contrary decisions (the citations pro and con are given in the opinions in both courts), we deem it unnecessary in this case to express any views thereon.

Judgment affirmed.